**AMERICAN FIRE & CASUALTY CO. v. JACKSON.**

No. 13329.

United States Court of Appeals
Fifth Circuit.

March 6, 1951.

Rehearing Denied April 2, 1951.

---

5. Gompers v. Buck's Stove & Range Co., supra, 12 Am.Jur., "Contempt", Sec. 62.

Russell, Circuit Judge, dissented.

J. Elton Huckabay, Baton Rouge, La., for appellant.

R. Gordon Kean, Jr., Baton Rouge, La., for appellee.

Before HUTCHESON, Chief Judge, and McCORD and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

This suit was brought against the defendant as the liability insurer of Carson Furniture Co., Inc., under an owner, landlord, and tenant policy insuring the company against liability for bodily injuries growing out of the operation of premises leased by it, to recover damages for injuries sustained by plaintiff's child, Linda, an infant less than one year old.

The claim was: that plaintiff was manager of the store and, with his family, an occupant of the residence apartment on the mezzanine floor; that when Linda and her mother, as members of his family, upon the father's invitation and with the consent of the corporation, having come up the stairs and proceeded to the apartment twenty feet away, were about to enter it, Linda pulled away from her mother and, because of the

negligence[1] of Carson Furniture Company, in maintaining the stairway with insufficient railings, fell through the opening in the stair rail onto the concrete surfacing of the main floor.

Defendant moved to dismiss the complaint for failure to state a cause of action. Its motion to dismiss denied, defendant answered, admitting that it had issued the policy sued on but denying generally plaintiff's allegations of negligence and fault and pleading the contributory negligence of plaintiff and Mrs. Jackson.

At the conclusion of the evidence,[2] defendant moved to dismiss and for a directed

1. Particularized, this was "That the stair rail encircling the mezzanine and the stairs was not a proper and reasonable safe guard, because of the approximate 2½ ft. gap between the top rail and the middle rail, and between the middle rail and the floor of the mezzanine and stairs, which opening was sufficiently large enough to permit a small child to fall through", and "That the injuries sustained by Linda Jackson were solely due to the gross negligence of Carson Furniture Co., Inc., * * * in failing to provide a safe and proper guard rail for its guests and customers and others invited to inspect the mezzanine or to go up to the living quarters located thereon."

2. This showed: that plaintiff was employed by Carson Furniture Co., Inc., as manager of the store; that as a part of his compensation he had been given the tenancy for himself and his family of the premises occupied as a residence on the mezzanine floor; that the insurance policy had a clause which, for an additional premium, covered the premises occupied as a residence; and that Mr. Carson has testified that the premises had also a back entrance, and had a rental value of from $75 to $85.

For six weeks Jackson had been alone in the premises and two or three days before the accident, his wife and baby had joined him. Mrs. Jackson, who was the only eye witness to the accident, testified that during the three days they had been there, the baby had been up and down those stairs numerous times but not by herself, stating, "No, she never walked up or down these stairs by herself prior to the time she fell." She testified further, "Sometimes I carried Linda, other times she walked and held on to my hand." She further testified that she herself was familiar with the railings around the stairs and had not anticipated any danger because "We didn't let her go upstairs by herself here or anywhere else. She was too young to walk up by herself." That, however, she walked extremely well at the time of the accident. This is the way she said the accident happened:

"Q. Will you explain in your own words just how the accident occurred? Begin with where you started from in the store and lead up to the time the child fell. A. The best I remember I carried her up the stairs until I got to the top. I put her down and she was holding my hand. We were walking to the door of the apartment and before we got to the door I guess she wanted to go back downstairs and she went back to go downstairs. She got as far as the top of the stairs—that is the reason I asked you whether you considered that the mezzanine or the stairs—and started to go back down. She squatted down to go down the stairs and fell between the stair and the middle railing. It is in this picture around the post.

"Q. At the time that you went upstairs with Linda did you carry her upstairs or did she walk upstairs? A. I don't remember for sure. Like I say, sometimes she walked and sometimes I carried her.

"Q. Were you accustomed to holding Linda by the hand when she walked up and down the stairs? A. Yes sir.

"Q. Did you ever let her walk up and down the stairs with you when you were not holding her hand? A. No, sir.

"Q. At the time that you carried her up the stairs at this particular time, did she go willingly or not? A. Yes. She went willingly.

"Q. Was there anything on the part of Linda at the time she went upstairs at any time to indicate that she wanted to go downstairs? A. No. Until she turned and started back downstairs she showed no indication that she wanted to, other than just turning to come down.

"Q. What were you doing at the exact moment she turned around and started back down the stairs? A. I was opening the door.

"Q. Did you have her by the hand at that time? A. No, I had just turned loose her hand to open the door to the apartment.

"Q. What first attracted your attention to the fact that Linda was trying to go back downstairs? A. I opened the door and went to catch her hand

verdict on the ground that no case of negligence on the part of Carson Company was made out. This motion was reserved, the case was sent to the jury, and there was a verdict for plaintiff for $6500.

Defendant's motion to dismiss and its alternative motion for a new trial on the grounds (1) that the motion for a directed verdict should have been granted, and (2) that the verdict is excessive and appears to have been given under the influence of passion and prejudice, was denied, and defendant has appealed.

Appellant is here insisting that Linda was not an invitee but a mere licensee, but that if she was an invitee, it is the settled jurisprudence of Louisiana as set out in Guidry v. Hamlin, La.App., 188 So. 662; Browne v. Rosenfield's, Inc., La.App., 42 So.2d 885, and similar cases, that no negligence was shown, no case of liability against its insured made out, and the judgment should be reversed and here rendered.

In the alternative it insists that the judgment should be reversed for abuse of discretion in refusing to grant a new trial because of the excessiveness of the verdict, and the cause should be remanded with directions for trial anew.

Appellee, on his part, insisting with equal vigor that Linda was an invitee and that the cases on which appellant relies for reversal and rendition are not in point, and, further, that there was no abuse of discretion in denying the motion for new trial for excessiveness in the verdict, urges affirmance.

■ We agree with appellant that the verdict was excessive, as matter not of fact but of law, that is, that there was no basis in pleading or evidence for the submission of the issue of permanent injuries, and, without such, no basis for a verdict of such size. Permanent injuries have not been alleged, and not only is evidence of permanent injury entirely lacking, the evidence offered is completely inconsistent therewith.[3]

■ As the authorities cited in the brief of appellant show, the Louisiana rule is "One claiming permanent injury must prove it with reasonable certainty; proof that permanency was probable being insufficient." Klein v. Medical Bldg. Realty Co., La.App., 147 So. 122. In Bartholomew v. Impastato, La.App., 12 So.2d 700, 707, the court said: "It is our view that the opinions voiced by Drs. * * * as to the conditions which may develop in the future, are too speculative to warrant the conclusion that the injuries to the child are permanent." While the case is not from Louisiana but from Texas, Texaco Country Club v. Wade, Tex.Civ.App., 163 S.W.2d 219,

---

and take her inside, and evidently she had run, because she got over there pretty quickly. I was there by the time she was at the top of the steps fixing to go down and was reaching for her when she fell, and she sort of slipped through my hands, because I was reaching for her as she was falling down.

"Q. Did Linda fall from the balcony or from one of the steps on the stairs: A. It is the top stair, but it is part of the balcony. I would not consider it a step. It is the top."

It was shown that the distance from the apartment door to the stairway was 22 feet, and that when Mrs. Jackson released Linda's hand to open the door, Linda broke and ran in an attempt to go downstairs. After the accident happened, two other rails were added to the stairway, reducing the openings between the rails to about 14 inches.

Plaintiff offered the testimony of an architect that the construction of the stair and rail in the building was not a customary method of construction and that the usual space between rails of that kind was 13 to 14 inches instead of 27½, as was the case here. On cross examination, while testifying that he knew of another store in Baton Rouge with one hand rail, he stated that he had not seen many of that kind.

3. Dr. Van Gelder, the only medical witness, stated on direct examination, "The probabilities are she won't have any permanent injury because she has done so well over this last year."

On cross examination, he testified: that her recovery from the accident "has been uneventful", that there had been nothing in her recovery to indicate that there was any permanent impairment of her faculties in any way; that "she is to all intent and purposes a normal child just as she was prior to the accident; while on redirect examination, after stating that it would not be possible to say that the child would not suffer some future disability, he stated that his opinion was that "she would be all right".

224 is also in point. There a doctor was permitted to testify that there was a two to five percent chance that the plaintiff's disabilities would persist after three years. The appellate court stated: "Under this state of facts, we think that the portion of the jury's verdict which awarded the minor appellee $4,000 for future physical pain, $4,000 for future mental suffering, and $5,000 for future diminished earning capacity, not having been based on competent testimony, should not be allowed to stand," and the judgment was ordered reversed, absent a remittitur of $13,000.

If, therefore, we could agree with appellee that the action of the court below, in refusing to direct a verdict was not error, we should, nevertheless, order the judgment reversed because of the error of the district judge in refusing to grant a motion for new trial for excessiveness in law of the verdict.

Of the opinion, however, for the reasons hereinafter stated, that the denial of the motion to direct a verdict was error and the judgment should be reversed on that ground, the judgment will be reversed for that error, rather than for the excessiveness in law of the verdict.

██ We agree with appellee: that plaintiff's wife and Linda were on the premises not as mere licensees but, as the wife and daughter of plaintiff, the sub-tenant of Carson, there by invitation of plaintiff and of Carson, the lessee of Wilson, lessor and owner of the premises; and that Wilson and Carson, Inc., and, therefore, the defendant, the insurer, would have been liable if Linda's injuries had been caused by their negligence as alleged.

We agree with appellant, though, that under the law of Louisiana, as fully and carefully set down in Guidry v. Hamlin, supra, a case precisely in point on its facts, and in Browne v. Rosenfield's Inc., supra, no negligence was shown.

The only differences between Guidry v. Hamlin and this case are as follows. There the child was two years old. Here it was less than one. There the lower rail of the bannister was 19½, here it was 27½, inches above the floor. There the suit was against the owner, lessor. Here it is against the insurer of the lessor and his lessee. There the court, assuming that Civil Code Articles 2692 and 2693 placed upon the lessor obligations in favor of a member of the tenant's family, stated his nonliability thus: "* * * the only requirement which might to any extent be considered pertinent here is that the thing leased must be in condition suitable for the purpose for which it was leased. It is apparent that the rail in question was perfectly safe for all persons except those so young or so small as to require special care and attention. There is nothing dangerous to the normal person in such a rail. There is danger only if there is involved one so young as to be incapable of exercising care, and, in the case of so young a person, everyone is justified in assuming that special attention, or care, or supervision, will be afforded by parents or others in authority. * * *" [188 So. 664.]

██ Appellee, pointing out that the above quoted portions of the opinion state the law as to the liability of a lessor under Sections 2692 and 2693 of the Code and not under Article 2315, which is the basis of liability asserted here, insist that what was said there is not in point here. As this further quotation from the Hamlin case will show, this will not avail him:

"* * * It is true that, under Art. 2315 of the Civil Code, liability to any person, whether tenant or anyone else rightfully on the premises, might result from negligence in creating such a trap as we have referred to; but, surely, even that article cannot be construed as placing upon a house owner liability merely because he does not make his building foolproof, or because he does not so construct it as to make it impossible for infants to injure themselves. There is no negligence because, surely, such a house owner may assume that such very young children will be protected by older persons responsible for them. * * *

"Surely, one who leases a building even for residential purposes and even if he knows that the family of the tenant includes young children, may assume that those in authority will protect such young children and will see to it that they are not permitted to wander alone on galleries, or in other

places from which they might fall.

"We do not base freedom from liability upon the contributory negligence of the parents, but solely upon the fact that there is no negligence in the owner of the building in failing to foresee that the parents will not protect their very young children against such dangers."

■ Browne v. Rosenfield's Inc., while dealing specifically with the attractive nuisance doctrine is to precisely the same purport. This is that, in the law of Louisiana, negligence cannot be predicated of common and ordinary objects such as walls, fences, stairs, and gates, and other used and useful structures and apparatus, and conditions arising in and from the ordinary conduct of a business, which are safe for use by adults, merely because they cannot be safely used by babies unattended by adults, charged with the duty to look after them.

That this is the general law of Louisiana, under Articles 2315 and 2316, and not merely the law of lessor and lessee, is further emphasized by what is said in Biegel v. City of New Orleans, 143 La. 1077, 79 So. 867: " * * * The municipal authorities have a right to presume that, for every child under the age of discretion, there is some one of mature judgment on whom rests the special duty and responsibility for the safety of the child."

The cases of Salter v. Zoder, 216 La. 769, 44 So.2d 862, and Vidrine v. Evangeline Gravel Co., 6 La.App. 468, on which appellee relies, are not at all in point. In the first case, the negligence charged and proved was the placing on a paved driveway of a stack of lumber covered by galvanized iron extending beyond the edges on all sides, an obstructive condition which was negligent on its face. The only questions argued there were whether the child of the sub-tenant was a trespasser or a licensee, and the defendant owed the same duties and obligations to the sub-tenant and members of his family as to the tenant, though the sub-tenant paid rent directly to the tenant.

The case would be authority for the holding that Wilson, the owner and lessor of the building here, and Carson Furniture Co., and their insurer would be liable to Linda as the child of the sub-tenant, if negligence had been shown. It is not authority for holding that there was negligence here.

In Vidrine's case, the suit was by an adult, the wife of an employee, for damages caused to her by a cogwheel without a cover which was being operated in connection with a water well, and the court very correctly held: that the plaintiff was entitled to be where she was and to do what she was doing when she got hurt; that defendant was guilty of negligence; and that she was not guilty of contributory negligence.

Defendant's motion for a directed verdict should have been granted. For the failure to grant it, the judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

RUSSELL, Circuit Judge, dissents.

Rehearing denied; RUSSELL, Circuit Judge, dissenting.