Rosselyn E. ORR and Ross M. Orr

v.

**FIRST NATIONAL STORES, INC.**

Supreme Judicial Court of Maine.

Aug. 17, 1971.

Burton G. Shiro, Waterville, for plaintiffs.

Wathen & Wathen by Daniel E. Wathen, Augusta, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY and WERNICK, JJ.

WERNICK, Justice.

On appeal. Defendant claims erroneous a judgment resulting from a jury verdict for plaintiffs as modified by a remittitur ordered by the presiding Justice and accepted by plaintiffs to reduce the damages recovered by the plaintiff-minor, Rosselyn E. Orr, from $2500.00 to $1500.00, and by her father, Ross M. Orr, from $500.00 to $250.00.

The appeal asserts that the presiding Justice was incorrect (1) in various rulings made by him during the course of the trial, (2) in portions of the charge to the jury over objections of defendant and (3) in his denial of a motion for judgment n. o. v. filed by the defendant in compliance with Rule 50(b) M.R.C.P.

We decide that the presiding Justice acted properly in denying defendant's motion for judgment n. o. v. since the evidence raised issues of fact as to the liability of defendant for determination by a jury under appropriate instructions of law by the court. We sustain the appeal, however, because in his charge to the jury the presiding Justice gave instructions regarding the scope of defendant's duty of due care in maintaining its premises which were prejudicially erroneous and to which defendant had made timely objection.[1]

*The Motion for Judgment N.O.V.*

The presiding Justice's ruling on defendant's motion for judgment n. o. v. is to be tested by the application of the

---

1. It is unnecessary, therefore, that we decide as to other errors assigned by defendant predicated on allegedly incorrect rulings of the presiding Justice during the earlier course of the trial.

familiar principle that the evidence must be taken in the light most favorable to plaintiffs. On the evidence thus considered the following factual situation could have been found by the jury.

On March 18, 1968 the plaintiff-minor Rosselyn E. Orr, 8 years of age, together with a girlfriend of similar age, accompanied Rosselyn's mother, Stella V. Orr, to the supermarket of defendant located at Main Street, Waterville, Maine, in which Mrs. Orr intended to do shopping. After all three had entered the store and had walked among various aisles in which merchandise was displayed, the two children requested of Mrs. Orr, and were given, some pennies with which to purchase bubble gum from among a group of gum dispensing machines located near the entrance-exit area of the store.

This area contained two metal framed doors, one for ingress swinging inward and the other for egress swinging outward onto the sidewalk and street area. As one would look from inside to the exterior of the store the entrance door would be to the right and the exit door to the left. Each door opened automatically whenever a person, or object, came upon a tread placed in front of it. Four gum dispensing machines were stacked immediately adjacent to the exit door, on the left if one were departing from the store.

The two doors were separated throughout their height by a metal-framed glass panel approximately one foot in width. Commencing approximately four to six inches from this panel and running at a right angle to it into the interior of the store, there was a stainless steel tubular railing serving as a divider of the respective sections for entrance and exit. It was shaped so that, perpendicularly with the line of the floor, it formed a rectangle (with rounded top edges) of metal (except for the line of the floor), the rectangle being slightly more than four feet in depth into the store and approximately three feet in height. Half-way between the two sides

of the rectangle was a third middle support running from the top of the railing to the floor. All of the stainless steel railing was tubular in form, approximately three inches in diameter and sufficiently smooth to be slippery to the touch.

The trajectory of the ingress door brought the door on its inward course as close as six to ten inches to the metal railing divider. Underneath the railing there was only empty space except for the middle tubular support. Thus, a child could easily use each half of the tubular railing as a swing rod, to swing over and under and even to complete, with sufficient adroitness, a full circle swing. The gum dispensing machines were located within four feet of the divider railing.

After Mrs. Orr had given Rosselyn pennies to go to purchase bubble gum, the two girls left Mrs. Orr at a place near the middle portion of the store. They went to the front to the gum dispensing machines. Rosselyn was about to purchase gum when she observed that her friend had begun to swing on the railing. With her attention thus diverted from buying gum, Rosselyn herself went to the railing and commenced swinging. She had swung one time and "then the second time I was leaning over when Kenny Phair [an employee of defendant, who had been running the cash registers which were located about five to six feet farther inside the store from the railing] told me to get off, off the railing. I couldn't get back up, so I just slipped and fell." (R. p. 36) When she fell, Rosselyn struck her mouth on the floor and the impact caused two upper teeth to be fractured leaving a "V" shaped opening.

Prior to March 8, 1968, employees of the defendant store, including the manager, had observed children swinging on the railing "quite frequently" or "fairly often." The manager had himself cautioned children about swinging, and the manager was aware of dangers to children not only because they might swing and fall from the railing but also because of the proximity of

the entrance door to the railing as it opened inward to admit patrons.

■ On the foregoing facts the jury was justified in concluding that the plaintiff-minor, Rosselyn E. Orr, was a "business *invitee*" of the defendant at all times and places relevant in the case. This proposition is supported by either of two legal approaches. First, the overwhelming majority rule in this country, of which we approve, is that a young child who accompanies her mother into a store in which the mother is intending to shop (and regardless of whether the mother could have readily made other arrangements to avoid having her young child with her while she is shopping) is, like the mother, a business invitee of the store. Altman v. Barron's Inc., 343 Mass. 43, 175 N.E. 2d 506 (1961); Milliken v. Weybosset Pure Food Market, 71 R.I. 312, 44 A.2d 723 (1945).[2] Second, the fact that Rosselyn herself was about to make a purchase in the store of bubble gum, merchandise designedly offered for her special interest and benefit, makes her, independently of her mother, a business invitee of defendant. Shaw v. Piel, 139 Me. 57, 27 A.2d 137 (1942) and cases cited therein predicating business invitee status upon the mutual economic benefit theory.[3]

■ As a business invitee upon defendant's premises Rosselyn was owed by the defendant the duty that defendant would exercise reasonable care to provide her with premises and installations which were reasonably safe for her use. Walker v. Weymouth, 154 Me. 138, 145 A.2d 90 (1958); Jamieson et al. v. Lewiston, Gorham Raceways, Inc., Me., 261 A.2d 860 (1970).

This general principle subdivides into two aspects which are fundamentally distinct and which require independent theoretical analysis, although, under particular circumstances, there might be an overlap in application. For convenience of discussion we shall undertake the subsidiary inquiries in an inverted order.

We consider, first, whether the evidence, taken in the light most favorable to plaintiffs, would warrant a rational jury in concluding that the ordinarily careful storekeeper—(that hypothetical creature postulated by the law as the standard of judgment),—in the light of all the circumstances known by him, would believe that the conditions and installations in the store of defendant exposed a child business invitee, of the approximate age of eight years, to risks of harm *greater* than are *reasonably* to be tolerated.

■ In evaluating this question, we commence with the proposition that the ordinarily careful owner or occupier of land will anticipate that young children have propensities to intermeddle and to indulge impulses to play and climb. See Collentine v. City of New York, 279 N.Y. 119, 17 N.E.2d 792, 795 (1938). The law holds further, that even if young children are intellectually aware of potential dangers,

2. See collection of the cases in the Annotation in 44 A.L.R.2d 1319.
   Also: Restatement of Torts, Second, Sec. 332, Comment g.

3. In this connection, compare the change in the technical concept of *"invitee"* made between the first and second Restatement of Torts, § 332. In the second Restatement of Torts, § 332 was changed to broaden the definition of "invitee" to include not only a "business visitor" (defined in the traditional "economic benefit" terms) but also a "public invitee" defined as "a person who was invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public." Thereby the second Restatement of Torts reveals an acceptance of a more modern approach now utilized by many courts that "the basis of liability is not any economic benefit to the occupier, but a representation to be implied when he encourages others to enter to further a purpose of his own that reasonable care has been exercised * * *." (Prosser on Torts, 3d Ed. 1964, p. 398).
   Further, see the excellent analysis in O'Keefe v. South End Rowing Club, 64 Cal.2d 729, 51 Cal.Rptr. 534, 414 P. 2d 830, 16 A.L.R.3d 1 (1968).

they are reasonably to be expected, emotionally and behaviorally, to ignore, or to assume, known or obvious risks of harm. In Searles v. Ross, 134 Me. 77, 181 A. 820 (1936) this Court, commenting on the thoughtlessness and heedlessness natural to boyhood, said that children as old as thirteen years of age are likely to act dangerously to themselves even though, upon reflection, they know better.

Worthy of consideration, too, is the analogous situation in which this Court has held that tendencies to play even by an adult, in the form of "horseplay" on business premises, may, when known or reasonably to be anticipated, become attributable to the business operation as creating risks of harm for which the owner, or operator, is legally responsible. Petersen's Case, 138 Me. 289, 25 A.2d 240 (1942).

■ In addition, the law attributes to the ordinarily prudent owner or occupier of business premises awareness that various installations which are innocuous to children (when used as intended) attract children to utilize them in unintended, but nevertheless reasonably foreseeable, ways and that, as thus *misused*, the facilities can subject the children to *unreasonable* risks of harm which are likewise *reasonably recognizable*. Kataoka v. May Department Stores Co., 60 Cal.App.2d 177, 185, 140 P.2d 467, 474 (1943); requoted in Crane v. Smith, 23 Cal.2d 288, 144 P.2d 356, 361 (1943); Thacker v. J. C. Penney Company (5 CCA) 254 F.2d 672, cert. den. (1958) 358 U.S. 820, 79 S.Ct. 31, 3 L.Ed.2d 61.

When the presiding Justice adverted to the "attractiveness" that various facilities might, or do, have for children, as a factor bearing upon the issue of defendant's alleged causal negligence, counsel for the defendant, at the trial of the case, protested that such approach by the court was a resort to the doctrine of "attractive nuisance" which has been consistently rejected in Maine. Counsel persists in the same claim before this Court.[4]

The contention, however, reveals a fundamental misconception. Defense counsel seems to have had a reflex reaction by which the mere mention of the word "attractive" automatically brought to his mind the connotation of "nuisance". As a result, the argument of counsel for defendant projects a double fallacy.

First, counsel has been induced to overlook that the evidence justified the jury conclusion that plaintiff-child was a business invitee to whom defendant, under well established Maine law, owed a duty to exercise reasonable care to provide premises reasonably safe for her use.

■ Irrelevant, therefore, is the dictum by this Court in Cogswell v. Warren Brothers Road Co., Me., 229 A.2d 215, (1967), to which counsel for defendant has directed our attention, purporting to explain the underlying rationale of the "attractive nuisance" doctrine to be that *"allurement" to the premises* functions to transform a child, otherwise a trespasser or bare licensee, into an invitee under limited circumstances and for restricted purposes.[5] Even if "allurement" *to* the prem-

---

4. At the trial defense counsel stated to the court: "I would object to the Court's instructions that the occupier of the land has the duty * * * to take precautions against that which might attract children. It seems to me that this is in essence a charge of attractive nuisance, and predicating liability upon the mere existence of something which is likely known * * * to be * * * attractive to children." (R. p. 84)

5. The correctness of this single—aspect explanation is open to doubt in the light of the subsequent developments of the law during the past 50 years showing that many courts have used varying techniques and theories to afford relief to young children who have been trespassers upon land.
See, for example, the analysis in McGettigan v. National Bank of Washington, 115 U.S.App.D.C. 384, 320 F.2d 703

ises be considered the factor upon which the so-called (but poorly named) "attractive nuisance" doctrine operates, in the present case the "attractiveness" of the installation to children is material, *not* to show attraction *onto the premises* to establish an initial "invitee" status but rather— a genuine business invitee status having been established—, to measure the compliance of the defendant with the resulting legal obligation to exercise due care to provide reasonably safe premises and facilities in the light of the corollary principle that special precautions must be taken to conform to the standard of care when *child* business invitees, and their unique and known or reasonably foreseeable propensities, are involved.

The second element of incorrectness in defense counsel's position is that after having erroneously accused the presiding Justice of invoking the "attractive nuisance" doctrine and maintaining that it should be thrown from the case because Maine law has rejected it, defense counsel himself by a "reverse english" maneuver seeks to bounce it back into consideration. He maintains that the railing, if used as intended, is without "inherent danger" to children and thus cannot be as to them, a "nuisance"; hence, defendant must be held free of legal liability. In this manner defense counsel has undertaken to import from the "attractive nuisance" doctrine the "nuisance" component. He is attempting to utilize a limited extension which some solicitous courts, excluding Maine, have developed as a gesture to benefit child "trespassers" or licensees (whom the common law rigidly regarded with disfavor as a species of "wrongdoer"), and improperly to transform it into the absolute controlling principle by which the recovery of a child *business invitee,* a person in no respect a wrongdoer but who has a privileged status upon the premises (and as to whom,

therefore, "attractive nuisance" principles are really irrelevant), will be *defeated.*

While the common law had manifested a feudalistic concern to shield the "lord of the manor", it had, nevertheless, traditionally allowed a business invitee to recover damages for injuries sustained when the owner or occupier of land would fail to exercise reasonable care to provide reasonably safe premises to a *business invitee.* The principle applies to *child* invitees as well as adults. To incorporate into the investigation of the reasonable safeness of the premises and the reasonableness of the conduct of the defendant the principles that (1) in cases involving *child* business invitees instrumentalities upon premises can create unreasonable risks of harm to them *only if* the instrumentalities are "inherently dangerous" to children (and thus a "nuisance" as to them) and (2) that the misuse by children of installations, otherwise reasonably safe, despite that the misuse is actually known or reasonably foreseeable by the owner or occupier of the premises, can *never* become a basis to impose liability upon defendant—would be to commit egregious error in two respects. First, it would be really to take ultimate refuge in a major aspect of the "attractive nuisance" doctrine and to fly in the face of Maine's rejection of the doctrine. Second, it would be to transform one constituent of the "attractive nuisance" doctrine into the absolutely governing criterion constituting a *total measure* of reasonable care, reasonable safety and reasonable foreseeability.

The correct approach, to be employed in circumstances when the injured child is a *business invitee* upon the premises and the immediate question is whether the child business invitee has been afforded a reasonably safe place for use, is to discard concepts such as "nuisance", traps, instrumentalities which are "inherently dangerous" to children (even if properly used)

---

(1963) and its summary of the criticism of the "allurement" *to the* premises concept, as relied upon by Justice Holmes in United Zinc and Chemical Co. v. Britt,

258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615, 36 A.L.R. 28 (1921).

See also: Prosser, Law of Torts, 3rd Ed. at p. 374.

and to concentrate upon the fundamental principle of the *reasonableness*, or the *unreasonableness*, of the risks of harm engendered by the premises, facilities, instrumentalities, or combinations thereof, in the light of the *totality of the circumstances*, as the ordinarily prudent storekeeper would apprehend the circumstances and foresee the dangers of harm generated by them,—including the reasonably recognizable dangers resulting from the reasonably foreseeable *misuse* of the premises by children in the light of their known, or reasonably recognizable, propensities.

■■ It is undoubtedly correct that a storeowner is without duty to insure safety to a business invitee. He is, nevertheless, under legal obligation to use ordinary care to ensure that the premises and facilities are reasonably safe for *all* invitees, young children as well as adults. While *the standard* of judgment is the same, (reasonable care and reasonable safety), to meet the standard the storekeeper must observe different precautions and degrees of care in relation to *child* invitees. The general principles governing have been concisely and incisively delineated in the leading cases of Kataoka v. May Department Stores Co., supra, and Crane v. Smith, supra.

"The known characteristics of children, including their childish propensities to intermeddle, must be taken into consideration in determining whether ordinary care for the safety of a child has been exercised under particular circumstances. * * * One who *invites* children upon his premises must take 'whatever precautions *ordinary care* would dictate to protect the *invited* children from *any instrumentality* he maintains upon his premises which is *likely to attract them* and subject them to dangers *which a reasonably prudent person would anticipate.*'" (144 P.2d at p. 361 of Crane v. Smith quoting in part from 140 P.2d at p. 472 of Kataoka v. May Department Stores). (emphasis supplied.)

These same principles have been thoroughly analyzed and applied in an important case which involved an installation innocuous to children *if used as intended* but which became unreasonably dangerous when put to *misuse* by children in a manner *reasonably to be anticipated.* Thacker v. J. C. Penney Company (5 CCA) 254 F.2d 672, cert. den. (1958) 358 U.S. 820, 79 S.Ct. 31, 3 L.Ed.2d 61.

In this case in the rear of the store there was a balcony about nine feet above the first floor. The balcony was protected by

"an attractively finished railing of oak and tempered masonite, varnished and waxed, three-feet-six-inches high. The railing consists of a base eighteen inches high surmounted by four horizontal bars, suitably spaced, six inches from bar to bar, like the rungs of a ladder, as if designed as a sort of Jungle Jim for young children to climb. On the top rail overlooking the store a small boy would gaze with wonder at the scene below him and feel like stout Cortez [Balboa] silent upon a peak in Darien. This was the setting, as the appellants presented the case.

"The appellee takes a dim view of this presentation of the case. The only danger here was the danger of a very young child falling from an ordinary balcony railing commonly found in Penney stores. * * * the railing was strong and safe and especially constructed to prevent people and merchandise from falling off. The object of using rails instead of a solid wall of the same height was to allow the merchandise to be seen from the ground floor." (p. 674)

Testimony in the case revealed that it was known among the employees of the store that children were "attracted" to the balcony railing to play on it and climb on it to look over it.

In deciding that the court below had erroneously entered a judgment for defendant notwithstanding the verdict of the jury

in favor of the injured child, the Court of Appeals, Fifth Circuit, speaking through Judge Wisdom, said:

> "Age and the ability of a child to realize danger, the peculiar attraction certain installations have for children, childish impulses, the knowledge that young children frequently in the past had been attracted to an installation are all circumstances to be taken into account in determining whether a storeowner has complied with his duty of care to an invitee who is a child." (p. 678)

In its further analysis the court concluded that:

> "If * * * the construction of the railing was such that a reasonable person might expect young children on the balcony to be attracted to climbing the railing, (p. 678)

a jury would be justified in concluding that the premises involved unreasonable risks of harm to child invitees as to which defendant was

> "under the duty to use due care to discover this danger and to protect its invitees against the peril." (p. 678)

Also: Hammontree v. Edison Bros. Stores, Inc., Mo.App., 270 S.W.2d 117 (1954).[6]

In the present case the evidence warrants jury conclusion of the existence of a conglomerate of instrumentalities and facilities upon defendant's store premises constituting an installation as follows:

(1) A stacked arrangement of four gum machines some of which, at least, dispensed *bubble gum*, merchandise of special interest to children, such that in precisely that area children would be reasonably expected, because invited as prospective purchasers, to be present frequently not only singly but also in groups;

(2) the area being in the *immediate vicinity* (within four feet) of the tubular railing divider such that children, singly or in groups, would be likely to have the railing brought *specifically* to their attention;

(3) the railing divider being so constructed, especially because of the empty space underneath, that children tending to notice it would be attracted to swing upon, over and under it, either from a particular child's own impulses or from the thought of imitating what another child might be seen to have done;

(4) the defendant's knowledge of this peculiar attractiveness of the railing to children and their propensity to use it as a swing bar mechanism insofar as defendant, by its authorized agents, had noticed children using it in precisely this fashion, "quite frequently" or "fairly often";

---

6. This case is noteworthy, additionally, because it elucidates, as we have ourselves attempted, supra, the fallacy of confusing the "attractive nuisance" doctrine with the entirely different principle that the attractiveness of even an ordinary instrumentality—(harmless when used as intended)—to be made a potentially dangerous plaything by children is validly a factor among the totality of circumstances bearing upon the issue of reasonable foreseeability as an incident of the evaluation of the appropriate discharge of the duty of reasonable care. As the Missouri court observes: "Counsel for plaintiff is careful to point out in his written argument that plaintiff was an *invitee* on defendant's premises, *not a trespasser*, and therefore was not required to prove as an essential element of his case that he was *attracted to the premises* by the glass door and panels *and that they were inherently dangerous*. As heretofore stated the rule here applicable is that requiring ordinary care * * * for invitees * * *, as qualified by the further rule that where the *invitees* are *children* special caution is necessary." (p. 127) (emphasis supplied)

(5) an ordinarily careful storekeeper's reasonable anticipation, because he knew that the tubular railing divider was approximately *three inches in diameter* and had a *slippery* surface, that the small hands of young children seeking to grasp such a slippery tube, for the purposes of swinging, would encounter difficulties and be likely to have an inadequate grip on the bar, such that there was a reasonable likelihood that they would fall; or, alternatively, that since the storekeeper knew that the railing divider was within less than one foot of the trajectory of the ingress door as it would swing inward, a child using the railing upon which to swing might well be struck by the door as it opened or be startled into falling from the railing by the likelihood of contact with the door or patrons who might be entering through the door, or other persons who might be coming to the vicinity.

Under all these circumstances it was open to reasoning minds on a jury to form differing conclusions as to whether, in the light of reasonable foreseeability and expectancies, the defendant was maintaining its premises, in the vicinity of and including the railing divider, in a manner which generated *unreasonable* risks of harm to child *invitees* of the age of plaintiff, Rosselyn Orr. It should be emphasized that it is unessential that the *precise* manner in which injuries might have occurred, or were sustained, be foreseeable, or foreseen. It is sufficient that there is a reasonable generalized gamut of greater than ordinary dangers of injury and that the sustaining of injury was within this range. Hatch v. Globe Laundry Co., 132 Me. 379, 171 A. 387 (1934); Hersum v. Kennebec Water District, 151 Me. 256, 117 A.2d 334, 53 A.L.R.2d 1072 (1955). It was, therefore, a jury question whether the defendant had provided reasonably safe premises, and a reasonably safe installation upon the premises, for the use of the child invitee, the plaintiff, Rosselyn Orr.

We turn now to the second aspect of the duty of care owing by defendant to a business invitee upon its premises,—namely, whether, if the defendant had failed to provide *reasonably* safe premises or installations, defendant had acted as an ordinarily prudent and reasonably careful storekeeper in allowing the situation which yielded the unreasonable risks of harm to child invitees (as above described) to remain as it was or whether, in the exercise of ordinary prudence, there was some change of design or arrangement of facilities or some other effective preventive, or warning, technique which defendant should have undertaken.

The prior discussion has indicated that the *unreasonableness* of risks imposed on child invitees in the present instance lay in the reasonable expectancy that the railing would be used by children for *swinging* and that the railing was so constructed and situated that it could reasonably be expected to subject those *swinging* upon it to undue risks of harm.

Defendant can argue with cogency that as an ordinary careful storekeeper it should be free of any duty to undertake to make changes in the railing itself which would tend to make it a *safer swing bar*, since such undertaking could place defendant in the paradoxical situation of being ·potentially negligent by *encouraging* children to make an *improper* use of an instrumentality designed, and intended, for store rather than playground purposes.

The correctness of such contention fails, however, to overcome the salient point that the obligation of defendant, were defendant acting with ordinary care, could have been directed reasonably toward reasonable efforts to *minimize* or *eliminate* the *known attractiveness* to, and the consequent foreseeable dangers of the use by, children of the railing *as a swing*.

Defendant seeks to avoid the impact of this obligation by taking refuge in the prin-

ciple that the plaintiff had been accompanied to the store by her mother and that the mother should have controlled the child in accordance with the duty of a parent. To the extent that this argument of defendant purports to *relieve* the storekeeper of *his obligation* to diminish, or prevent, the likelihood of childish misuse of instrumentalities which serve a legitimate function in the store and which are innocuous to child invitees unless misused by them, the argument of defendant misses the essence of the problem. The contention is wide of the mark because, as we have previously mentioned regarding another aspect of the position of defendant, it seeks to carry over considerations of public policy which have underlain this Court's refusal to accept the "attractive nuisance" doctrine, in relation to child *trespassers* or *licensees*, into another area—the concern for safety of a child *business invitee*—and in which the public policy factors have been, traditionally, fundamentally different.

When this Court said in Cogswell v. Warren Brothers Road Co., Me., 229 A.2d 215 (1967), reiterating language from Lewis v. Mains, 150 Me. 75, 104 A.2d 432 (1954).

"The legal duty of restraining children from going into unsafe places is imposed by law upon their parents, and those who stand in *loco parentis*, and is not imposed upon strangers. * * * The parental duty of restraint implies the parental power of correction, or of the use of preventive force." (pp. 219, 220),

this Court was referring *only* to the expression of a public policy that

"the public should not be required substantially to assume unlimited responsibility for * * * safety"

of

"uncontrolled and undisciplined children [who] *trespass* with impunity * * *." (p. 219) (emphasis supplied)

This discussion was entirely without bearing upon the situation in the case at bar

in which (1) the child is a *business invitee* upon the premises of the defendant; such that (2) the defendant owes a duty to exercise reasonable care to provide reasonably safe premises and installations for the use of the child; and such that (3) in the evaluation of (a) the *reasonableness* of the safety of the premises and its installations as well as (b) the scope of the *reasonable* care owing, the totality of circumstances affecting the range of prudent foreseeability must be considered.

The public policy controlling when a child has been *invited* by a storekeeper upon its premises is succinctly and forcefully stated by Judge Wisdom in Thacker v. J. C. Penney Company, supra.

"Society is interested in preserving children from harm, certainly from exposure to a danger they are too young to realize, when that danger is in a store to which they are invited and *when the danger may be eliminated with relatively little inconvenience to the storeowner.* We think that, whether or not parents have a high and inescapable moral duty to take care of their children, it is against public policy for a storeowner to open his store to children and *escape his duty* to provide [reasonably] safe premises.

"In balancing the competing interests of a landowner and a visitor injured as a result of a condition of the premises, the quasi-sovereignty of an owner or occupier of land must yield to the superior interests of society in protecting the life and limb of future citizens; at least to the extent of having the jury decide, in a case such as this, whether the occupier's conduct measures up to the standard of due care to provide [reasonably] safe premises for children who are business visitors or invitees." (254 F.2d at p. 685) (emphasis supplied)

The same point is emphasized in Crane v. Smith, supra, when the court says:

"Any want of due care upon the part of a parent, * * * *does not excuse the*

*negligence of the proprietor in failing to take proper precautions* for the safety of children whom he has expressly or impliedly *invited* upon the premises, * * *." (144 P.2d at p. 364) (emphasis supplied)

The ultimate rationale is that:

"The gist of negligence is the foreseeability of harm, using the objective standard of a reasonable man. A storeowner or other occupier of land may assume that a mother when accompanied by a young child will protect the child from an open and obvious danger. *But that is simply one of the circumstances to be weighed with all of the other circumstances in deciding whether a particular defendant on the facts of the particular case is negligent.*" Thacker v. J. C. Penney, supra, (254 F.2d at p. 680) (emphasis supplied)

■ Reliance upon the adequate control and supervision of the parent is, therefore, only one circumstance amongst the totality of relevant circumstances bearing upon the storekeeper's *duty* to exercise reasonable care in relation to child invitees. It is *without absolutely controlling* effect to *supplant*, or *eliminate*, this duty.

■ Significant among the totality of circumstances bearing upon the dictates of reasonable care to diminish, or remove, the known use by child invitees of the tubular railing divider as a swing bar, and the consequent unreasonable risks of harm to children engendered by such use, would be the relative ease, inconvenience and inexpensiveness with which the spaces under the railing could have been filled in or covered—thereby to deter or diminish the tendency of children to be attracted to the railing for purposes of swinging. At least, it was open for reasonable minds among the jury to differ as to whether the defendant storekeeper's conduct in electing to do nothing about the premises and declining to take effective steps to minimize, or over-

come, the railing's attractiveness to, and use by, children as a *swinging bar*, as shown by actual experience, was a lack of ordinary prudence under all of the circumstances to provide premises, facilities, and installations free of *unreasonable* risks of harm to such of its business invitees as are young children.

The presiding Justice was, therefore, correct in rejecting the contention of defendant that, as a matter of law, defendant must be held free of causational negligence in relation to plaintiffs. This issue was properly one for determination by the jury under appropriate instructions of law from the court.

■ Likewise correct were the court's rulings that the comparative causational negligence, if any, of the plaintiff, Rosselyn Orr, and of her mother,—imputable to Rosselyn under Maine law even though Rosselyn might have been old enough to exercise some degree of care for her own safety, Day v. Cunningham, 125 Me. 328, 133 A. 855, 47 A.L.R. 1229 (1926),—were questions appropriate for jury decision.

■ The conduct of Rosselyn, as a child of eight years of age, was to be judged in accordance with the standard of what might be expected of ordinarily careful children of like age, capacity, and experience, as they would tend, naturally and expectably, to act under similar circumstances. Chickering v. Lincoln County Power Co., 118 Me. 414, 108 A. 460 (1919); Brown v. Rhoades, 126 Me. 186, 137 A. 58, 53 A.L.R. 834 (1927); Ross v. Russell, 142 Me. 101, 48 A.2d 403 (1946).

As was aptly enunciated in Searles v. Ross, 134 Me. 77, 181 A. 820 (1936):

"The case of Kremposky v. Mt. Jessup Coal Co., Ltd., 266 Pa. 568, 109 A. 766, lays down the broad rule that a child nine years old will not be held guilty of contributory negligence as a matter of law. Though in this jurisdiction we have not in every instance adhered to this doc-

trine, we nevertheless realize that the application of the well-settled rule governing the responsibility of young children will result in holding in all but exceptional circumstances that the negligence of a child of such tender years is a question of fact to be settled by the jury." (p. 83, 181 A. p. 823)

■ The case at bar is well within the usual situation rather than one presenting "exceptional circumstances." The comparative causational negligence, of the child Rosselyn Orr, if it existed in any degree, and if so, to what extent it might be applied fairly and equitably to reduce the damages recoverable by her, were appropriate issues for the jury to resolve.

■ As to any alleged comparative causational negligence of the mother, Stella Orr, to the extent it would be imputed to the child-plaintiff, Rosselyn, the presiding Justice was correct in holding the issue to be proper for jury decision. The jury was entitled to believe the testimony of Mrs. Orr that she had been in the store with her daughter, and her daughter's friend, for only six or seven minutes (R. p. 20), that she was half-way in the store when the children left her to go to purchase bubble gum and at that spot at least thirty to forty feet from the front of the store (R. p. 14), that the location of the gum dispensing machines was unknown to her (R. p. 16), and that, therefore, she was unaware of the proximity of the gum machines to the railing divider (R. p. 15), and finally that, as she had observed her child and the other girl while they were with her, the children had been well-behaved at all times without running around or hiding under displays (R. pp. 19, 20). Under these circumstances whether Mrs. Orr had acted toward her child, Rosselyn, with ordinary care was a matter exclusively for the judgment of the jury.

The presiding Justice properly denied the motion of defendant for judgment n. o. v.

*The Alleged Prejudicial Errors in the Charge*

■ The preceding discussion has delineated in detail that the law of Maine avoids imposing upon an owner, or occupier, of land an obligation to provide a business invitee with premises which are *completely safe*—i. e., which are free of any and all hazards or risks of harm. Rather, the duty is that the owner or occupier of land shall exercise reasonable care to provide premises which are *reasonably safe*. Walker v. Weymouth, supra, and Jamieson et al. v. Lewiston, Gorham Raceways, Inc., supra. Thus, *some* hazards, or risks of harm, may exist without violation of duty, provided that they are ordinarily tolerable under the totality of circumstances in which the business is usually conducted and life is lived in its varying contexts. If, therefore, a defendant owner, or occupier, of business premises offers conditions and installations which are free of *unreasonable* risks of danger to business invitees, including child invitees, even though some hazards are present, defendant is without legal liability.

In the present case the presiding Justice gave the jury instructions which, in at least three significant instances, purported to enunciate a principle different from the established law of Maine.

At the commencement of his analysis of the duty of care owed to a business invitee the presiding Justice charged:

"And he must maintain the store, and construct the store, and not have *any hazards*. Or if there is one he cannot eliminate, he must warn the person, the invitees, that there is *such a hazard*, if he has knowledge of it. That is the duty of the storekeeper." (R. p. 74) (emphasis supplied)

In further amplification of the storekeeper's duty the presiding Justice said:

"We * * * have another rule of law. That a person who operates premises, or

owns premises that he not have *any hazard* that is attractive to children, * * *. Now if he has something that attracts the children, and it is *hazardous*, if it's necessary, then he should have some warning or some protection to keep the children from it. That's a duty that he owes." (R. p. 75) (emphasis supplied)

Finally, in summarizing the issues of the duty of care owing to a business invitee, the presiding Justice told the jury:

"Was there *a hazard* which they had knowledge of? Was there a sufficient warning, if there was *a hazard?*" (R. p. 76) (emphasis supplied)

The effect of all of these instructions, which we deem to be unremedied even when the charge is considered in its entirety, was to instill firmly in the minds of the jury the basic thought that liability could result from the maintenance of *any hazard whatever* to children, regardless of whether the hazard or the risk of harm, was reasonably to be endured by patrons, including children, of a place of business. Thus instructed, the jury might well have imposed liability upon the defendant because the jury believed that some risks of danger to children were present even though, under proper instructions, the jury might have concluded that they were neither extraordinary nor greater than reasonable under all the circumstances.

This error of the presiding Justice in the instructions to the jury was duly objected to by the defendant, as follows:

"I would object to the Court's charging in several instances, the Court referred to the duty of the occupier of land not to permit a hazard to exist, * * *. I think it should be an undue hazard, or an unreasonable hazard rather than just a plain hazard. * * *" (R. p. 84)

The objection of the defendant was a correct statement of the law to the Court, and the omission of the presiding Justice to remedy the deficiency, once the defend-

ant's objection had specifically called the matter to his attention, rendered the error subject to review in this appeal.

█ In a case such as this in which, in the final analysis, there will inevitably be a delicate balancing of factors relating to the risks of danger to which defendant had exposed the child-plaintiff and in which potentially strong differences of opinion among jurors might be resolved precisely by shadings as to ordinary, or extraordinary, hazards, the failure of the presiding Justice to clarify for the jury the significant differences between *any hazard* and an *unreasonable hazard* could have misled the jury to the detriment of the defendant. There was thus prejudicial error in the charge.

The entry must be:

Appeal sustained. Remanded to the Superior Court for new trial.

MARDEN, J., did not sit.

POMEROY, Justice (concurring).

I agree with all my colleagues on this Court that the jury verdict for the plaintiffs must be set aside for the reasons stated in the majority opinion. Unlike my colleagues who have dissented, I would not order judgment n. o. v. for the defendant. Because of certain statements found in the excellent dissenting opinion filed herein, I desire to state separately my reason for agreeing with the majority opinion.

The child whose injury occasioned this law suit was, all agree, an invitee on defendant's premises. The defendant, owner of the premises, had a legally enforceable duty to exercise *reasonable* care to keep its premises *reasonably* safe for her use. Its standard of *conduct* is determined by weighing the magnitude of the risk of harm to its invitee against the utility of its conduct. Its conduct is negligent toward the plaintiff only if it involves a risk of causing damage

to her which is to be considered unreasonable when measured against the ease or difficulty with which the potential danger may be obviated.

A reasonable store proprietor must be expected to anticipate and guard against the conduct of others in some situations. His duty to take precautions against the negligence of others arises wherever and whenever a reasonable man would recognize the existence of an unreasonable risk. It becomes most obvious when he has reason to know that he is dealing with persons whose characteristics make it especially likely that they will do unreasonable things. When children are invited on the premises less care and poorer judgment are necessarily to be expected of them than would be expected of an adult.

The dissenting opinion suggests that the majority view in this case enlarges the duty of the storekeeper "to one of extraordinary care and for all practical purposes make[s] the storekeeper an insurer of customer safety." If I had so viewed it, I would not have joined in the majority opinion.

I am mindful we are concerned only with the question: Was the jury acting reasonably in finding as it did?

We are not determining facts in the first instance.

With the general principles of law above enumerated in mind, I will briefly review the factual basis for my conclusion that the jury had a right to conclude that toward this plaintiff the defendant acted negligently.

The child whose conduct is the subject of this inquiry was 8 years and 10 months old. On the issue of contributory fault, it is well established by a series of decisions in this State, that a child of 3 years and 10 months of age is incapable, as a matter of law, of exercising care and that a child of 9 is to be held responsible for the degree of care and prudence proportionate to his age.

" 'Between these two extremes lies a zone with shadowy and indefinite boundaries.'

The inference is that within that zone the question is one of fact for the jury."

Ross v. Russell, 142 Me. 101, 48 A.2d 403 at 405.

A jury question on the issue of contributory fault was clearly presented and decided favorably to the plaintiff.

The jury saw the child. We have not.

We cannot say as a matter of law the child was even *capable* of contributory fault.

The sole remaining question becomes: Was it unreasonable for this jury to conclude that this storeowner-defendant violated the legal duty it assumed by becoming a storekeeper to exercise reasonable care to keep its premises reasonably safe for this plaintiff?

The jury could properly conclude there was such violation. To put it another way, we ought not declare, as a matter of law, it was unreasonable for the jury to so find.

It was not unreasonable for the jury to find these facts: The storeowner-defendant installed a group of gum machines very near the entrance to its store.

The gum machines were deliberately so arranged and displayed to attract children to that area.

There were two guardrails at the entrance to the store designed to protect customers entering and leaving the store from being struck by opening doors.

The defendant had knowledge that in the past, children had used these rails as a device upon which to swing.

If it had taken such simple steps as placing a canvas cover over the opening in the rails or tying cords or ropes so as to cover partially the opening in the rails, swinging on the rails would not have been possible.

Being forewarned, as the storeowner was, that it was the propensity of some children to swing on these rails, we cannot say it was

unreasonable for a jury to declare that there was a duty to guard against this propensity.

The jury was warranted in concluding from the evidence that the plaintiff entered the store in company with her mother and another child; that they traveled through several aisles after entering the store; that the two children solicited money for the express purpose of going to the gum machines which were located near the rail and getting gum from them; that the child who was with the plaintiff did swing on the rails after having been attracted to the area of the rails by the gum machines which were put there for the express purpose of attracting children; that the plaintiff saw her companion swinging on the rail and wishing to imitate her companion, started to swing; that she had completed one swing and was at the top of the second swing when the defendant's agent instructed both children to get off the rails. Plaintiff found herself unable to climb down and fell to the floor, causing injury to her person.

On these facts, I am unable to say the jury verdict was unjustified as a matter of law.

It is for this reason that I have joined in the majority opinion and not because I would be willing to declare or even intimate the owner of the store ought to become an insurer.

WEBBER, Justice (dissenting).

Although I agree with my Brothers that the jury verdict for plaintiffs must be set aside for the reasons stated in the opinion of the Court, I would go further and order judgment n. o. v. for the defendant.

The facts are well and fully stated in the opinion and it is only necessary here to restate certain facts for emphasis—facts which in my view are most significant and controlling within the framework of applicable principles of law. The minor plaintiff was eight years and ten months old.

She was a responsive and intelligent witness and must be deemed to have acquired some of the experience common to her age group and some appreciation of her own skill and capacity in situations requiring strength and coordination. She was attracted to the guard rail not by its proximity to the gum vending machine but by her desire to imitate her companion who first "started swinging on the bar." Although there are references to "swinging" on the bar, the inference from the testimony is inescapable that the child Rosselyn had climbed on top of the bar and was lying across it just before she slipped forward and fell to the floor. Rosselyn described her fall in these terms:

"And the second time *I was leaning over* when Kenny Phair told me to get off, off the railing. *I couldn't get back up, so I just slipped and fell.*" (Emphasis mine)

There is no claim or suggestion that the guard rail was not safely and properly designed and constructed for the purpose for which it was installed, that is, to direct customer traffic to the proper doors and prevent injury to a customer from the automatic opening of a door. Although there was evidence that children had engaged in "swinging" on the bar in the past and been ordered to desist by the management, there was no direct evidence that children had on past occasions climbed on top of the bar and certainly no suggestion that any child had ever suffered a fall. Finally, it must be noted that as soon as Rosselyn was observed *"on the railing,"* defendant's employee "told her to get off."

The rule is well established that the proprietor of a business establishment owes to his patrons the duty of *exercising reasonable care* to keep the premises reasonably safe. It is important to note that he is not required to keep the premises reasonably safe but only to exercise ordinary and reasonable care to that end. In short, he is not required to exercise *extraordinary care* nor is he an insurer of the safety of his patrons while on the premises. The opinion

of the Court restates and reaffirms this rule and intimates no intention to change or enlarge it. My concern is that in applying the rule to the facts of this case and permitting the imposition of liability upon the defendant, we do in effect enlarge the duty to one of extraordinary care and for all practical purposes make the storekeeper an insurer of customer safety.

The distinction between reasonable care and extraordinary care has been decisive in a number of cases. In Walker v. Weymouth (1958) 154 Me. 138, 145, 145 A.2d 90 we concluded that reasonable care would not disclose the presence beneath the grass of a loose rock which injured an adult plaintiff. Query then as to whether in the case of a child plaintiff the doctrine of the instant case would go so far as to impose upon an invitor, having in mind the known propensities of children to run and jump in a "hayfield," the duty to exercise that extraordinary care which alone would compel him to find and remove every loose rock? In Hawkins v. Maine & New Hampshire Theaters Company (1933) 132 Me. 1, 164 A. 628 we held that defendant was not negligent in giving away balloons to its young theater patrons and the care required to restrain the "ordinary inclinations of children" did not require that defendant "provide an attendant for every child." See also Lander v. Sears, Roebuck & Co. (1945) 141 Me. 422, 44 A.2d 882; Charpentier v. Great Atlantic & Pacific Tea Co. (1931) 130 Me. 423, 427, 157 A. 237, 238, wherein the Court said, "Not only can the defendant company not be held as an insurer, but it cannot be held responsible for failure to use *extraordinary care*, and, in the case before us we feel that to sustain the verdict *would be equivalent to placing such a burden upon it.*" (Emphasis mine).

The case of Thacker v. J. C. Penney Co. (1958) 5 Cir., 254 F.2d 672 is readily distinguishable on its facts. Here the injured plaintiff was but two years and two months old. At this age no understanding or appreciation of risk or danger was possible, a factor which defendant was bound to recognize. The railing, 3½ feet high, ran along the edge of a balcony on the mezzanine or second floor. Thus the danger was that one falling from the rail would drop from nine to twelve feet to the first floor with the near certainty of death or very serious injury as a result. It is apparent that the Court was impressed both by the extreme youth of the plaintiff and the extent of the danger. The Court said, "In this case the railing was dangerous only to children too young to realize its danger." Moreover, the Court characterized as "the most important of these other circumstances" the fact that an employee had on three occasions removed the child from the railing to which he had escaped from his mother. The Court thought that on these facts "a jury might find that (the employee) knew that (the child) was *in a perilous situation*, and find also that her failure to return the *two-year old child* to his mother or to place him in the hands of a responsible employee was conduct that just does not measure up to the standard of due care imposed on a store owner and his employees." (Emphasis mine). As I note the reasoning and the emphases placed by the Thacker Court, I am by no means persuaded that if the rail had been a mere divider on the main floor with a risk of fall of no more than 3½ feet and the child had been nearly nine years old, that Court would have reached the same result. In a concurring opinion, Hutcheson, Chief Judge, made some observations which in my view would apply with even more compelling force to the case before us. He said, "I think the law did not and does not require a storekeeper to wall all balconies in to keep some possible child from climbing on a railing any more than to wall off his escalators, his stairways, his chairs and his tables, and if it were not for the (employee's) testimony (as to knowledge of child's peril), I would say no case for a jury was made out. I do not think the law goes anywhere near as far as I think the majority opinion does in giving directions to store-keepers that they must make their stores safe for two year old children *when the supposed lack*

*of safety consists not in defective construction or negligent maintenance but in a construction which is neither out of the ordinary nor in any way defective.* I think we had just as well say that, because a small child if allowed to get away from his mother will get hurt by a fall down an escalator or out of a window or off a table or chair, a store owner can't have any of those things *without a guard standing by.*" (Emphasis mine).

The majority opinion cites Hammontree v. Edison Bros. Stores (1954) Mo.App., 270 S.W.2d 117. In that case the plaintiff, aged one and a half years, injured his finger in a crack between a glass door and a glass panel. The liability imposed on defendant store owner appears to rest almost exclusively upon the age of the child "[who] could not be expected to know that the door was movable and the panel or jamb immovable," a fact which would have been readily apparent to a somewhat older child. I am by no means satisfied that the Court would have reached the same result in the case of a child old enough to comprehend what he saw and "appreciate the risk involved when he placed his hand against the door or panel."

In Kataoka v. May Dept. Stores Co. (1943) 60 Cal.App.2d 177, 140 P.2d 467, 471 the plaintiff, a four year old boy, put his hand between the comb plate and the moving steps of an escalator. Applying the principle that ordinary care includes special caution where very young children are invitees, the Court stressed both the age of the child and special danger inherent in moving machinery. The Court said, "Children of such an age ordinarily could not appreciate the danger of putting their fingers in or around moving machinery, but would be attracted by it, especially if it were bright, and would be likely to investigate with their fingers anything to which they were attracted." There is a strong intimation that defendant should have posted a guard where operating machinery, readily accessible to very young children, was in-

volved. Clearly, the Kataoka facts are far removed from those of the instant case.

In Crane v. Smith (1944) 23 Cal.2d 288, 144 P.2d 356 the defendant maintained a brightly painted coffee mill in the aisle in a location accessible to the public and to the three year old plaintiff who put her finger in the grinder and was injured. Here again the primary factors permitting recovery were the extreme youth of the child and the accessibility and dangerous quality of the machinery. The Court noted that "the customary position of unguarded coffee mills is behind the counter and not upon an aisle." Moreover, the Court carefully distinguished Connelly v. Carrig (1926) 244 N.Y. 81, 154 N.E. 829 in which a contrary result was reached, noting that the plaintiff there was ten years old and there was no indication that he was too young to appreciate the risk involved in sticking his finger into the coffee mill. The California Court, balancing the utility of defendant's conduct against the magnitude of the risk involved, concluded that no particular interest of the defendant was advanced by maintaining the mill in the aisle whereas the risk to meddling children was great indeed. The very factors which obviously weighed heavily in the mind of the Crane Court serve to produce a very different result when applied to the factual situation in the instant case.

In my view what we are here concerned with is the intentional misuse by a child invitee of otherwise safe premises and we must exercise care lest we distort the rule of ordinary care into one of absolute insurance. In Pepperling v. Emporium Mercantile Co. (1937) 199 Minn. 328, 271 N.W. 584, 585, the seven year old plaintiff was injured when the cover of a displayed cedar chest as a result of his own action fell on his finger. The Court recognized that "ordinary care should take into consideration the normal propensities of children," but could "see no reasonable ground for the defendant to anticipate that the display of these cedar chests, either open or closed upon the floor of its store, would or might

result in injury to anybody. * * * To hold that a jury might consider this negligent would be to go beyond the requirement of ordinary care and to establish a rule requiring a very high degree of care upon the part of such storekeeper." Dealing with the failure of an employee to intervene to prevent injury, the Court said, "It would have been obviously beyond her power to reach the boys at the single instant that she saw the lid raised higher than they (plaintiff and another boy) had previously been raising the lids on the other chests."

The Pennsylvania Court balanced risk against burden in Jacob v. Pittsburgh (1938) 330 Pa. 587, 198 A. 639, 640. A heavy door was slammed shut injuring the hand of the nine year old plaintiff. A claim of negligence rested on the failure to supply a stopping device or post an attendant. The Court said, "A stopping device would, of course, obviate the danger, but the risk of harm is so small as to make it unreasonable to require that all doors be thus equipped. To require an attendant to guard the door would be even more burdensome, and, balanced with the risk involved, entirely unreasonable. It would set too high a standard of duty for a municipality, and make of it almost an insurer of safety."

Recent cases disclose no trend toward departure from the rule limiting the duty owed to children to ordinary care to keep the premises reasonably safe.[1]

In Gleason v. Housing Authority (1946) 354 Pa. 381, 47 A.2d 129, 130 the Court denied liability for a fall from the top of an unsupervised sliding apparatus. The opinion is significant here primarily because of its reliance on language quoted from McHugh v. Reading Company (1943) 346 Pa. 266, 268, 30 A.2d 122, 123 wherein it was said, "No danger is more commonly realized or risk appreciated, even by chil-

dren, than that of failing; consciousness of the force of gravity results almost from animal instinct. Certainly a normal child nearly seven years of age—indeed any child old enough to be allowed at large—knows that if it steps or slips from a tree, a fence, or other elevated structure, it will fall to the ground and be hurt. It may be that some children, while realizing the danger, will disregard it out of a spirit of bravado, or because, to use the language of the Restatement, of their 'immature recklessness,' but the possessor of land is not to be visited with responsibility for accidents due to this trait of children of the more venturesome type."

In my view no liability can be imposed in the instant case without requiring that defendant exercise extraordinary care to keep the premises absolutely safe. Unless we are of the view that in this modern age a store owner has no right to install doors which automatically open and close for the convenience of the public, we must recognize that he has a further right and duty to install and maintain proper devices to make the operation of such doors safe and effective. This guard rail was such a device. It served to prevent customers, both children and adults, from incurring the hazard of being struck by a suddenly opening door. It also furnished a hand support for customers in an area often rendered wet and slippery in inclement weather. In short, it served a most useful and necessary function as a protective device. This utility to the owner must be balanced against the possible risk of injury resulting from the use of the device. That risk was negligible. Children too small to understand and appreciate the risk of a fall would not physically be able to climb on top of the rail. Children big enough and strong enough to mount the rail would ordinarily be dexterous enough to descend from it safely—as did Rosselyn's

1. Furness v. American Mutual Ins. Co. (La.App.1971) 242 So.2d 273—no liability to child meddling with candy vending machine; Pollick v. J. C. Penney Co. (1970) 24 Utah 2d 405, 473 P.2d 394—no liability to child climbing over stair

bannister in store; Rommel v. Louisville Shopping Center, Inc. (Ky.1968) 436 S. W.2d 529—no liability to child pushed from top of unsupervised sliding apparatus.

companion. As already noted, there was no evidence that any child had ever before fallen from the rail or been injured. The defendant was not required to foresee that one venturesome child physically able to climb on top of the rail would nevertheless lack the dexterity and coordination necessary to a safe descent. If the defendant had a duty to anticipate this unlikely event, what alternatives were available? It could remove the guard rail entirely—but in so doing it would greatly increase the very real danger of harm to all customers entering and leaving the store. The majority opinion suggests that it could alter the design of the guard rail by filling in or covering the spaces under the railing, thereby to deter or diminish the tendency of children to be attracted to the railing for purposes of swinging. But children climb to the top of fences and other structures for any number of reasons, or for no reason. I respectfully direct attention to the fact that this plaintiff was injured because she had climbed on top of the bar and fell from that position. A partition type of guard rail would, if anything, present less difficulty to a child bent on scrambling to the top than would a singular tubular rail which would offer no purchase for the child's feet in the climbing process. I do not think that we should permit a jury to speculate or conjecture as to whether one type of rail may be safer than another in the absence of any evidence that this guard rail was not safely and properly designed for its functional purpose.

Finally we turn to what seems to me the only alternative left if the defendant would meet the rigorous duty imposed by the majority opinion—the posting of a guard to prevent misuse of the guard rail. Here again the burden of compliance upon the store owner must be weighed against the risk of injury to be prevented. In my view the economic consequences of posting guards greatly overbalances the remote possibility of injury from a stationary guard rail, and such a requirement thus becomes one of extraordinary care. Moreover, every store is filled with counters and other objects upon which venturesome, unsupervised children can climb and from which they can fall—and the requirement of guards can thus be multiplied and the economic burden enlarged. Courts generally, as noted above, have been reluctant to make the posting of guards and attendants a factor in the exercise of ordinary care except in the case of accessible operating machinery or other equally dangerous conditions. In effect this was the view we expressed in Hawkins v. Maine & New Hampshire Theaters Company, supra.

This defendant cannot be charged with any failure to give warning. As above stated, this plaintiff at her age required no warning as to the obvious risk of falling from the top of a rail. In any event, such a warning was given at the first moment she was observed on the rail. Neither can the claim be made that the giving of the warning was itself negligence in that it startled the plaintiff so that she fell. Such a theory was effectively disposed of by the holding in Knowles v. Wolman (1944) 141 Me. 120, 39 A.2d 666.

I conclude that since the evidence, viewed in the light most favorable to the plaintiffs, shows no violation as a matter of law of the defendant's duty to exercise ordinary care to keep its premises reasonably safe for its business invitees, including the minor plaintiff, the motion for judgment for the defendant notwithstanding the verdict, seasonably made, should have been granted. I would now remand for entry of such judgment.

WEATHERBEE, J., joins in this dissenting opinion.